Filed 6/23/22  In re M.C. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.C. et al., Persons Coming Under the Juvenile Court Law. | B314143 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>M.C. et al.,<br><br>        Defendants and Appellants. | (Los Angeles County Super. Ct. Nos. 18CCJP04390G, 18CCJP04390H, 18CCJP04390I, 18CCJP04390J, 18CCJP04390K) |

        APPEALS from orders of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge Pro Tempore.  Affirmed with directions.

        Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant M.C.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant N.B.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant G.L.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

N.B. (mother), M.C., and G.L. appeal from the juvenile court's jurisdictional findings, removal orders, case plans, and findings under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA).  We conclude that the juvenile court's jurisdictional findings and dispositional orders were supported by substantial evidence and the case plans were within the juvenile court's discretion.  However, we find the juvenile court improperly added allegations of emotional abuse to those counts alleging physical abuse by M.C. under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b).  Lastly, we conclude the juvenile court's finding that ICWA did not apply was supported by substantial evidence.  We therefore direct the juvenile court to strike the allegations of emotional abuse in the counts against M.C.  In all other respects, we affirm.

## BACKGROUND

The family consists of mother, a daughter (born 2006), a son (born 2007), twins (born 2014), and an infant (born 2019).

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

M.C. is the presumed father of daughter and son.  G.L. is the presumed father of the twins.  Infant's father is unknown.

## I.    Referrals and initial investigation

The family was subject to three prior dependency cases, involving domestic violence and substance abuse.  The most recent case closed in July 2020 and mother received sole custody of the children.

In August 2020, DCFS received a referral that mother threatened to beat, shoot, and kill daughter.  A social worker contacted daughter at her paternal grandmother's home.  Paternal grandmother said that a few weeks prior, mother hit daughter that left a scar on her neck.

Daughter showed DCFS the mark on her neck that was still healing.  Daughter had asked mother why she was telling extended family members that daughter was "sucking dick."  Mother got upset and attacked daughter by choking her neck and hitting her with closed fists.  The other children and G.L. were present during the attack, but did not intervene immediately until G.L. told mother to stop.  Mother sent daughter a text message that read: "I will fuck u up don't ever fucking lie on me or accuse me of shit.  Answer that mf phone.  Y'all got me fucked up on my mam.  Did I listen to u when I came and got u . . . ?  Or when that first foster home didn't like u?  How about when dog molested you and I called the workers cussed them out and made my own police report when nobody else did bitch I have you best interest at heart motherfucker over ass kids and this the mf thanks I get.  I got both u motherfucker.  Bitch I ain't never spread no rumors about u fucking or sucking shit bitch how the fuck you date get mad at me like that bitch I'm sick of u disrespecting meeeee."  (Italics omitted.)  Mother called daughter

and said she was going to get gas and find daughter, beat her up, and kill her. Daughter felt suicidal because of mother's treatment and had tried to cut her arm with a knife a year ago.

Daughter also reported that mother got drunk and smoked marijuana. She said that mother would get drunk and fight with G.L. regularly. The day before, mother and G.L. got drunk and fought in mother's bedroom. Mother pushed G.L. out of the house and G.L. broke mother's bedroom window. Daughter watched the younger children when mother left them unsupervised for two to three days at a time to drink with family.

Daughter reported that mother physically abused her and the other children by hitting them with closed fists and extension cords on their backs and buttocks. She also said that G.L. punished the twins by hitting them with extension cords.

DCFS detained daughter in a temporary shelter and contacted mother, who said daughter was lying and refused to meet with the social worker.[2] Mother then went to paternal grandmother's home at 5:00 o'clock in the morning and was aggressive and belligerent.

## II.   Section 300 petition and emergency detention

DCFS filed a section 300 petition, alleging that mother and G.L. physically abused the children, they abused drugs and alcohol, they failed to protect the children from each other's behavior, mother left the children unsupervised for extended periods of time, and mother emotionally abused daughter. At an emergency detention hearing, the juvenile court detained

---

[2] Mother called the social worker two more times but hung up and then called DCFS 20 times in one hour.

daughter from mother, detained the twins from G.L. and released son, the twins, and infant to mother.

## III. Detention report and hearing

For its detention report, DCFS interviewed M.C., mother, son, the twins, and a social worker who had handled the most recent dependency case.

M.C. was living in Las Vegas, Nevada for the past four years. The last time he saw daughter and son was nine months ago for a brief visit, and then again three years before that. M.C. was subject to a restraining order protecting mother from him. Although M.C. had been sober for approximately two years and was currently attending 12-step meetings for alcohol, he received a DUI in Nevada. He was also receiving mental health treatment for post-traumatic stress disorder after he was shot in 2010.

Mother denied domestic violence in her home or that G.L. was living with her. Like M.C., G.L. was subject to a restraining order protecting mother from him. Mother generally denied daughter's allegations but admitted their relationship was strained. She thought paternal grandmother told daughter what to say to DCFS. When confronted with the text message to daughter, mother said she could not recall if she sent it but did not deny that it was from her. She denied any substance use except for occasional alcohol consumption with family. Mother was willing to drug test but said she did not have valid identification for the testing site. The social worker offered to take mother's photo and send it to the testing site as a substitute for identification, but mother declined, saying she would wait for her identification to arrive in the mail.

Son denied witnessing any domestic violence in the home and had not seen G.L. for a long time. He also denied that

mother used drugs or alcohol or that she physically disciplined the children.

Mother did not allow DCFS to interview the twins privately, asserting that they were too young and easily manipulated to be interviewed alone. When DCFS asked one of the twins how mother would discipline her, mother interrupted the child's answer and told her to say "by having [your] dollhouse taken apart." One of the twins said that son watched her at home, but mother corrected her, stating that mother also watched her. The twins had not seen G.L.

A social worker who handled the family's prior dependency case was concerned about the family because mother failed to complete her court-ordered services. She also received an anonymous text message that mother was abusing alcohol.

The juvenile court detained daughter from mother and ordered temporary placement with M.C. It detained the twins from G.L. and released them and infant to mother. It ordered son released to mother and M.C.

Approximately two months after the detention hearing, DCFS filed an ex parte application to detain the children from mother because she had been uncooperative, canceled appointments with DCFS, would not allow her home to be assessed, and did not allow the children to be interviewed privately. The juvenile court detained the children from mother and granted her monitored visitation. Daughter was placed with maternal aunt, son was placed with maternal great-aunt, the twins and infant were placed with the twins' paternal grandmother.

## IV.  Jurisdiction and disposition report

For its jurisdiction and disposition report, DCFS interviewed the children, G.L., M.C, maternal great-aunt, paternal grandmother to the twins, and maternal aunt.[3]

Daughter repeated that mother physically abused her and the other children, that she left the younger children in daughter's care, and that mother abused alcohol and marijuana. Mother called daughter a "hoe," "bitch," "dumb," "stupid," "immature," and told her that she should have aborted her.  She said that mother told son and the twins to lie about G.L., that G.L. still lived with mother, and that she saw him with mother during a recent visitation.

Son and the twins denied that they were physically abused or that mother emotionally abused daughter.  They also denied that mother used drugs or alcohol or that they were left unsupervised.  Son said that G.L. had not been around and that he never saw G.L. or his stuff at home.  When the social worker asked one of the twins about G.L., she said, "[h]e's good" and then said she had "never seen him."  The other twin said that she had seen G.L. "[l]ast time" at "the park."

M.C. had a history of criminal behavior, including multiple arrests for spousal battery.  A few days before DCFS's interview, M.C. was arrested for disturbing the peace stating, "I admit it, I was angry, and I was loud."  He said that he started using drugs when he was 14 or 15 years old, but got sober about 2 years ago.[4]

---

[3] DCFS was unable to interview mother for its report.

[4] M.C. was 32 years old at the time of the interview.

7

Maternal great-aunt was unaware of any abuse the children had suffered and had not seen any suspicious marks or bruises. She had not visited mother's home, but the children visited her often. The children did not tell her that mother abused drugs or alcohol. Nor did they mention G.L. or that they were left home alone.

Paternal grandmother to the twins said she took care of them and son during the last dependency case and that her relationship with mother had since deteriorated. She said G.L. would visit mother when he was in the area, but was unsure if he lived with her.

Maternal aunt had daughter and son over her home about once per month. She was unaware of any physical abuse to the children. Nor was she aware that mother had an alcohol or drug problem, stating that mother drank beer but not excessively. The children had not spoken to her about G.L. or whether they were left home alone.

## V.  Referral regarding M.C. and amended petition

DCFS received a referral from mother after daughter recorded a video of M.C. yelling at son. In the video, M.C. was angry about son's online absences from school and constant video game playing. He referred to son as "nigga" in a derogatory manner and told him that if he did not listen, he would "throw him" when he got back to Los Angeles.

Son sent a text message to a social worker, which read: "Miss don't tell my dad but this is [son] call me when you get a chance." About 20 minutes later, the social worker received a text message from M.C. stating: "We . . . never fixx our problems working together its either a fight or sumn else this is all non since for wat we doin straight im . . . [trying to] win in all ways

for us u working against me and all is I ask for was the dentist im feel am noticing the truth its fuck me for real u fake me for your satisfaction why wats yo real demeanor using my unborn child against me u think I wanna put the police in our bigness but shit get dangerous for a person who really stabbed me ur taking for granted and I really love u I cry all day in an[d] out . . . [trying to] see why u don't see this and it hard when u see the true colors of haters around you. At least once you know their true colors it hurts baddd."

M.C. sent another text message to the social worker, which said that a family member used M.C.'s phone. He then admitted that the message was meant for his wife and that they were having domestic problems because of the dependency case. He said he was being kicked out of his home and that he planned to move to Los Angeles to be with paternal grandmother and son until he and son could get their own place. M.C. had not completed counseling, anger management or parenting classes. When asked about the video of him yelling at son, M.C. said it had " 'been addressed and was over.' " The social worker discussed the possibility of a safety plan for son, but M.C. got upset and screamed at the social worker, stating that she "was only bringing negativity to him" and that mother was manipulating son. He then told the social worker to go to paternal grandmother's home and take son and his things and bring them to mother's extended family.

DCFS followed up with son who explained that M.C. "got mad for no reason because I was on the phone with my mom." M.C. told son that he was not going to allow anymore visits with mother and he was "going to tell the social workers to take away

all my visits." Son was afraid of M.C. "because of the way he's always been . . . aggressive and gets mad over nothing."

DCFS amended the section 300 petition, alleging that M.C. physically and emotionally abused son.

## VI. Detention report and hearing regarding M.C.

DCFS filed an ex parte application to detain daughter and son from M.C. For its detention report, DCFS interviewed son, daughter, mother, and M.C.

Son had been living with paternal grandmother for the past two months. He believed that no one in paternal grandmother's home could protect him from M.C. M.C. called son a "n[i]gga," "b[i]tch," and "f[a]ggot." He told son that he would not allow him to see mother. If M.C. came to live with son and paternal grandmother, son would live in fear of him. Further, paternal grandmother and paternal aunt would instigate arguments between M.C. and son and then watch it play out.

Daughter said that M.C. does not speak to her in the same manner as he did to son. She noted that M.C. and paternal grandmother picked on son. She did not feel comfortable in paternal grandmother's home because paternal aunt, who abused drugs, also lived there.

M.C. believed that mother and maternal relatives manipulated son and that "this situation was dropped in his lap, and that he tried his best to manage it[,] but he had no help."

Mother was glad that son was safe and living with relatives, but she wanted him returned to her care.

The juvenile court subsequently detained daughter and son from M.C.

10

## VII. Jurisdiction and disposition report

DCFS filed a second jurisdiction and disposition report and interviewed daughter, son, and M.C.

Daughter witnessed M.C. punch and slap son and call him names in 2016. She also saw M.C. throw son to the floor. Approximately five years ago, she saw M.C. punch son in the ribs.

Son said that M.C. punched him in the ribs twice, once seven years ago and again about three years ago. One time, M.C. picked son up from his bed and threw him on the floor. Son repeated that he was scared of M.C. and did not want to live with him once M.C. returned to Los Angeles.

M.C. wanted daughter and son to live with him. He denied physically abusing son or calling him names. He believed that mother was manipulating son and that "[t]his allegation is guided by a demonic spirit, his mom." M.C. further explained that he yelled at son in the video because son was smoking marijuana and missed almost two months of school.

## VIII. Jurisdiction and disposition hearing

The juvenile court held a jurisdiction and disposition hearing.

The juvenile court dismissed the emotional abuse count against M.C. and then added the emotional abuse language to counts a-4 and b-7. It dismissed counts a-2, a-3, b-2, b-3, j-2, and j-3 against mother and G.L. because there was no physical evidence of the type of abuse alleged in those counts.[5] However,

---

[5] Counts a-2, a-3, b-2, b-3, j-2, and j-3 alleged that mother and G.L. physically abused son and the twins by hitting them on the back and buttocks with their fists and extension cords.

11

it found daughter's statements credible that mother physically and emotionally abused her, mother left the children unsupervised and left daughter in charge of the younger children, mother and G.L. abused drugs and alcohol, and mother allowed G.L. to have access to the children. The juvenile court also found that G.L.'s and mother's alcohol abuse contributed to their domestic violence.

The juvenile court then sustained counts a-1, b-1, and j-1. Counts a-1, b-1, and j-1 alleged: "On prior occasions, [mother] physically abused [daughter] by striking the child's body with the mother's fists. In August of 2020, the mother choked the child and repeatedly struck the child with the mother's fists, inflicting a scratch to the child's neck. On prior occasions, the mother struck the child's back and buttocks with the mother's fists, and extension cords. On a prior occasion, the mother threatened to physically harm the child and threatened to kill the child by obtaining gasoline and to shoot the child with a gun. The child is afraid of the mother due to the ongoing physical abuse of the child by the mother. Such physical abuse was excessive and caused [daughter] unreasonable pain and suffering. Such physical abuse of [daughter] by the mother endangers the child's physical health, safety, and well-being and places the child and the child's siblings . . . at risk of serious physical harm, damage, danger[,] and physical abuse."

The juvenile court sustained count b-4. Count b-4 alleged: "On prior occasions, [mother] left the children home without supervision for an extended period of time. The children are of such an age as to require adult supervision. The father[s'] whereabouts were unknown. On prior occasions, the mother [left] [daughter] at home to watch the children for two or three

12

days.  The mother's failure to provide adult supervision for the children endangers the children's physical[ ] health and safety and creates a detrimental home environment, placing the children at risk of physical harm, damage[,] and danger."

The juvenile court sustained count b-5.  Count b-5 alleged: "[Mother] has a history of substance abuse and is a current abuser of alcohol and marijuana, which renders the father incapable of providing regular care of the children.  On prior occasions, the mother possessed, used[,] and was under the influence of illicit drugs while the children were in the mother's care and supervision.  The [twins and infant] are of such young age requiring constant care and supervision and the father's substance abuse interferes with providing regular care and supervision of the children.  [G.L.] failed to protect the children when [he] knew of the mother's substance abuse.  [G.L.] allowed the mother to reside in the children's home and to have unlimited access to the [twins].  The mother's substance abuse and [G.L.'s] failure to protect the [twins] endangers the children's physical health and safety, placing the [c]hildren at risk of serious physical harm, damage, danger[,] and failure to protect."

The juvenile court sustained count c-1.  Count c-1 alleged: "[Mother] emotionally abused [daughter] by frequently yelling at the child, calling the child derogatory, demeaning[,] and disparaging names, [and] speaking to the child in a harsh and abusive manner.  On a prior occasion, the mother threatened to physically harm the child and threatened to kill the child by obtaining gasoline and to shoot the child with a gun.  The mother's emotional abuse of the child has resulted in the child exhibiting emotional distress, suicidal ideation[,] and self-mutilation.  Such ongoing emotional abuse of the child on the

13

part of the mother places the child at substantial risk of suffering serious damage as evidence by severe anxiety, depression, withdrawal, and aggressive behavior toward herself or others."

The juvenile court sustained count b-6. Count b-6 alleged: "[G.L.] has a history of substance abuse and is a current abuser of alcohol, which renders [G.L] incapable of providing regular care of the [twins]. On . . . prior occasions, [G.L.] was under the influence of alcohol while the children were in [G.L.]'s care and supervision. The [twins] are of such young age requiring constant care and supervision and [G.L.]'s substance abuse interferes with providing regular care and supervision of the children. The mother knew of [G.L.'s] alcohol abuse and failed to protect the children. The mother allowed [G.L.] to reside in the children's home and to have unlimited access to the children. [G.L.]'s substance abuse and the mother's failure to protect the children endangers the children's physical health and safety, placing the children at risk of serious physical harm, damage, danger[,] and failure to protect."

With respect to M.C., the juvenile court sustained counts a-4 and b-7. Counts a-4 and b-7 alleged: "On numerous prior occasions, [M.C.] physically abused [son] which included punching him in the ribs. On another occasion [M.C.] picked up the child from his bed and threw him on the floor. [M.C.] was heard saying that he would throw the child on the floor and referred to the child as nigga." The children have suffered emotional abuse due to name-calling by M.C. "Such physical abuse was excessive and caused the child unreasonable pain and suffering. Such physical abuse of the child by [M.C.] endangers the child's physical and emotional health and safety and places

14

the child and [daughter] at risk of physical and emotional harm, damage, danger[,] and physical abuse."

The juvenile court removed the children from parents' custody and granted monitored visitation.  It ordered mother to submit to drug testing, complete parenting classes, participate in individual counseling, undergo a psychiatric evaluation, take all prescribed medications, and participate in therapy with daughter.  M.C. was ordered to participate in a 12-step program, anger management and parenting classes, and individual counseling.

The parents appealed.

## DISCUSSION

Mother challenges counts b-4, b-5, and b-6 and the dispositional orders removing the children and requiring her to participate in drug testing, undergo a psychiatric evaluation, and take any prescribed medications.[6]  M.C. challenges counts a-4 and b-7 for lack of substantial evidence and asks us to strike the allegations of emotional abuse.  He also challenges the dispositional orders removing the children from his custody and for monitored visitation, as well as the case plan requiring him to participate in a 12-step program.  Lastly, father asserts that DCFS failed to make an adequate inquiry under ICWA.

### I.    Justiciability

The parents acknowledge that jurisdiction over the children will remain regardless of the outcome of this appeal because they

---

[6] Pursuant to California Rules of Court, rule 8.200(a)(5), G.L. joined in mother's arguments regarding removal of the children from parental custody and denying placement of the twins with mother.

do not challenge every jurisdictional finding. As such, DCFS argues that the parents' challenges are not justiciable.

In a dependency case, a single jurisdictional finding supported by substantial evidence is sufficient to support jurisdiction and render moot a challenge to the remaining findings. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) Thus, we may " 'decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence' or is unchallenged." (*In re L.O.* (2021) 67 Cal.App.5th 227, 237.) However, we may exercise our discretion and consider the merits of an appeal when the challenged jurisdictional finding: (1) serves as the basis for dispositional orders that are also challenged on appeal; (2) could be prejudicial to the parent or impact current or future dependency proceedings; or (3) could have other consequences for the parent, beyond jurisdiction. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763.)

We agree with parents that a review on the merits is warranted here. With respect to mother, the jurisdictional findings in counts b-4, b-5, and b-6 serve as the basis for the dispositional orders removing son, the twins, and infant from her custody and requiring mother to drug test. DCFS asserts that the unchallenged counts related to mother's physical abuse of daughter are sufficient to support the removal orders and drug testing. However, the juvenile court found that mother abused daughter, but not the younger children. Nor was there a finding that mother's abuse of daughter created a risk of harm to the younger children such that removal of all the children was necessary to protect them. Further, the evidence did not show a connection between mother's substance abuse and the abuse of

16

daughter. Thus, counts b-4, b-5, and b-6 served as the basis for the removal of son, the twins, and infant, as well as the drug testing. Mother's challenge is therefore justiciable.

M.C. argues that his challenge to the jurisdictional findings is justiciable because they serve as the basis for the dispositional orders removing daughter and son from his custody, and could impact future dependency proceedings. We disagree with M.C. that the jurisdictional findings served as the basis for removal as he already lost custody of the children during a prior dependency case. Nonetheless, we will consider the merits of M.C.'s challenge because jurisdictional findings of intentional physical abuse could impact future dependency proceedings. (See *In re D.M.* (2015) 242 Cal.App.4th 634, 639; *In re Jonathan B.* (2015) 235 Cal.App.4th 115, 119.)

## II.   The juvenile court's jurisdictional findings are supported by substantial evidence

Section 300, subdivision (a), provides for jurisdiction where the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." The juvenile court "may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm." (*Ibid.*)

Section 300, subdivision (b)(1), provides for jurisdiction where the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent or guardian to

17

adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left."

Although section 300 requires that the child is subject to the defined risk of harm at the time of the jurisdiction hearing, the juvenile court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383.) The juvenile court may consider past events in deciding whether a child presently needs the juvenile court's protection. (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215–1216.) However, there " 'must be some reason beyond mere speculation to believe the alleged conduct will recur.' " (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146.)

We review jurisdictional findings for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We do not reweigh evidence or judge witness credibility. (*Ibid.*) "To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value." (*In re M.S.* (2019) 41 Cal.App.5th 568, 580.)

### A.    *Mother*

Mother's challenge to counts b-4, b-5, and b-6 amounts to a challenge to daughter's credibility. She disputes daughter's statements regarding mother's drug use, lack of supervision, and G.L.'s conduct. But attacking a witness's credibility on appeal is insufficient to meet mother's burden. We do not assess credibility, and the statement of a single witness is sufficient to establish a jurisdictional finding if credited by the juvenile court. Mother also points to evidence that contradicts daughter's

18

statements and notes that some were uncorroborated. But, like pointing to a witness's lack of credibility, pointing to evidence that does not support the juvenile court's orders is insufficient to meet mother's burden here. The substantial evidence standard requires us to make all reasonable inferences to support the juvenile court's order and disregard any contrary evidence as if it had been rejected. (*In re S.B.* (2008) 164 Cal.App.4th 289, 298.) Counts b-4, b-5, and b-6 were supported by substantial evidence.[7]

### B. *M.C.*

M.C. argues, and DCFS agrees, that the juvenile court improperly added language regarding emotional abuse of son to counts a-4 and b-7 even though emotional harm is not jurisdictional under section 300, subdivisions (a) and (b). We agree. Section 300, subdivisions (a) and (b) provide for jurisdiction when the child has suffered, or there is a substantial risk of the child will suffer "physical harm" while subdivision (c), provides for jurisdiction based on emotional harm. Accordingly, we will order the juvenile court to strike those allegations from counts a-4 and b-7.

The remaining allegations in counts a-4 and b-7 are supported by substantial evidence. M.C. argues that the physical harm to son was remote, and M.C. was living in Las Vegas at the time of the jurisdiction hearing. However, there was no indication that M.C. changed or would change his behavior when he returned to Los Angeles to take care of the children. Indeed,

---

[7] Mother also argues that DCFS did not connect her substance abuse with harm or risk of harm to the children. However, mother's and G.L.'s alcohol abuse was linked to their domestic violence in the presence of the children.

19

he said, when he got back to Los Angeles, he would throw son, demonstrating he was still capable of the same type of abuse that occurred years earlier. The recent threats to son notwithstanding, the record showed that M.C. had a long history of unaddressed violent and aggressive behavior. This included violent arguments with mother, which resulted in a restraining order; multiple arrests for spousal abuse; and a recent arrest for disturbing the peace. Son remained afraid of M.C. because he continued to be aggressive and get "mad over nothing." While M.C. disclosed that he was currently in mental health treatment for his post-traumatic stress disorder, he had not completed counseling or anger management or parenting classes, and resisted DCFS's attempts to facilitate services and counseling. Further, he screamed at the social worker when asked about a safety plan, repeatedly blamed mother for son's allegations, and told DCFS to take son away rather than recognizing how his behavior was contributing to son's fear.

Thus, even though the physical abuse was remote, the record showed that M.C. continued to behave aggressively, have domestic problems, and threaten son with physical abuse. Because his violent behavior persisted, the juvenile court could conclude the physical abuse would recur.

## III. Removal orders

Parents also challenge the removal orders, arguing that, if we reverse the jurisdictional findings, we must reverse the removal orders. They also contend that there were reasonable means short of removal to protect the children from harm. We disagree.

Section 361, subdivisions (c) and (d) authorize the juvenile court to remove a child, whose been adjudged to come within the

meaning of section 300, from a custodial or noncustodial parent's home if necessary to protect the child.  A juvenile court may not remove a child from a custodial parent's home unless it finds by clear and convincing evidence a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if the child were returned home, and there are no reasonable means by which the child's physical health can be protected short of removal.  (§ 361, subd. (c)(1).)  A child cannot be removed from a noncustodial parent unless the juvenile court finds clear and convincing evidence that there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent to live with the child or otherwise exercise the parent's right to physical custody, and there are no reasonable means by which the child's physical and emotional health can be protected without removing the child from the parent's physical custody.  (§ 361, subd. (d).)

In determining whether removal is warranted, the juvenile court must "consider whether there are any reasonable protective measures and services that can be implemented to prevent the child's removal from the parent's physical custody." (*In re D.B.* (2018) 26 Cal.App.5th 320, 332.)  It may consider a parent's past conduct and current circumstances, and the parent's response that gave rise to the current dependency case.  (*Ibid.*)  "The parent need not be dangerous[,] and the minor need not have been actually harmed before removal is appropriate." (*Id.* at p. 328.)  The goal is to avert harm to the child.  (*Ibid.*)

We review a removal order for substantial evidence keeping in mind the heightened standard of clear and convincing evidence.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

21

## A. *Mother and G.L.*

Mother and G.L. argue that if we dismiss counts b-4, b-5, and b-6, then son, the twins, and infant should be returned to mother's custody. However, because those counts are supported by substantial evidence, they still support the removal order.

Mother and G.L. also contend there were reasonable alternatives to removal because mother was a cooperative parent. The record belies their contention. A social worker who handled the prior dependency case was still concerned about family because mother had not completed her court-ordered services. During the present case, although mother began participating in her domestic violence and anger management programs, the record shows that mother repeatedly accused daughter of lying, refused to arrange meetings with DCFS, delayed drug testing, refused to allow the children to be interviewed privately, coached the twins during their interviews, refused to allow DCFS access to her home, instructed the younger children to lie about G.L., and repeatedly denied contact with him despite evidence to the contrary. Thus, while mother's progress in her court-ordered programs was commendable, mother's past behavior indicated that reasonable means and services were not available to prevent removal.[8]

---

[8] G.L. does not raise any individual arguments regarding removal of the twins or the juvenile court's refusal to place them in mother's custody. The juvenile court's reasoning for removing the children due to mother and G.L's alcohol abuse and their failure to properly supervise the children applies equally to the twins as it does to daughter, son, and infant.

**B.**   *M.C.*

M.C. argues there was no substantial danger to the children to justify removal and that there were other means to protect the children from harm.  Again, we disagree.

M.C. had a long history of violent outbursts that went unaddressed and persisted after the children were temporarily released to him and were in the care of paternal grandmother.  As discussed earlier, although M.C.'s physical abuse of son was remote in time, the evidence shows that M.C. intended to continue that behavior as soon as he returned to Los Angeles.  There was also evidence that paternal grandmother, who M.C. intended to live with, could not protect the children from M.C. because she instigated fights between M.C. and son.  Thus, there was a substantial danger to the physical health of the children if M.C. returned to Los Angeles to exercise physical custody over them.

M.C. also asserts that the juvenile court should have offered him preservation services, family therapy, or wraparound services to assist him in caring for the children.  However, the record shows that M.C. reacted negatively when confronted with the issues in the present case.  Instead of discussing a safety plan for the children or engaging with services, M.C. yelled at the social worker and asked DCFS to take son away.  Further, M.C.

continued to blame mother for son's allegations and did not take responsibility for his actions.

Accordingly, the removal orders were necessary and there were no other reasonable means to protect the children.

## IV.    Case plans

Mother and M.C. argue that the case plans were an abuse of the juvenile court's discretion.

The juvenile court may make "all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child." (§ 362, subd. (a).)  The juvenile court has wide latitude in fashioning appropriate dispositional orders for the care and support of the children, and is "not limited to the content of the sustained petition" in determining what would be in their best interests.  (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311.)  We review a dispositional case plan for abuse of discretion.  (*Ibid.*)

### A.    *Mother*

Mother contends the evidence did not justify the juvenile court's order that she undergo a psychiatric evaluation and take all prescribed medication.  However, mother's behavior warranted a psychiatric evaluation.  She threatened to beat, shoot, and kill daughter; accused her of "sucking dick"; and told her that she should have been aborted.  She told daughter, "I will fuck u up," and "bitch I have you best interest at heart motherfucker."  Further, mother showed up at paternal grandmother's home at 5:00 a.m. and was belligerent and aggressive.  She called the social worker more than 20 times in one hour and would call and hang up.  She was also generally uncooperative and canceled numerous appointments with social services.  From this conduct, the juvenile court could have concluded that a psychiatric evaluation was necessary to identify

24

any mental health issues that would have prevented mother's reunification with the children.

### B. *M.C.*

The juvenile court was within its discretion to order M.C. to participate in a substance abuse program. He admitted to a history of substance use and received a DUI while living in Nevada. Although M.C. said that he had been sober for two years, he was still participating in a 12-step program for alcohol. Given M.C.'s history of drug use and current participation in a 12-step program, requiring him to continue that 12-step program was not an abuse of discretion and ensured that any drug or alcohol abuse did not interfere with reunification.

Likewise, the monitored visitation order was not an abuse of discretion. M.C. had history of violent outbursts that included a recent arrest for disturbing the peace. He was recorded calling son names and threatening to throw him. He also told son that he would not allow him to see mother. Son repeatedly stated he was afraid of M.C. This evidence was sufficient to warrant monitored visitation until M.C. could show that unmonitored visits would be in the children's best interests.

## V. ICWA

Lastly, M.C. argues that DCFS breached its duty of inquiry by failing inquire about the children's extended family members, specifically, paternal grandmother and maternal aunt, about their possible Indian ancestry.

Pursuant to ICWA, in "any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's

25

tribe . . . of the pending proceedings and their right of intervention."[9]  (25 U.S.C. § 1912(a).)  This notice requirement enables a tribe to determine whether a child is an Indian child and, if appropriate, to exercise jurisdiction over a child custody proceeding.  (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8.)

During the pendency of a dependency proceeding, the juvenile court and DCFS have an affirmative and continuing duty to inquire whether a child is or may be an Indian child.  (§ 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a).)  The duty to inquire extends to, asking the child, parents, legal guardian, Indian custodian, extended family members, and others who have an interest in the child.[10]  (§ 224.2, subd. (b).)

---

[9] ICWA defines an " 'Indian child' " as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see § 224.1, subd. (a).)

[10] ICWA defines " 'extended family member' " as any person so defined by the law or custom of the Indian child's tribe, or in the absence of such law or custom, "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent."  (25 U.S.C. § 1903(2).)

26

We review the juvenile court's ICWA findings for substantial evidence.  (*In re D.F.* (2020) 55 Cal.App.5th 558, 565.)

M.C. argues that DCFS breached its duty of inquiry under ICWA because it did not ask the paternal grandmother and maternal aunt about Indian heritage.  We disagree.

There is a split among the Courts of Appeal as to a child welfare agency's duty to investigate a child's possible Indian ancestry where the parents deny any Indian ancestry.  Several Courts of Appeal have held that, even where a parent denies any Indian ancestry, section 224.2, subdivision (b) requires DCFS to inquire of a child's extended family members regarding his or her possible Indian ancestry.  (See *In re Antonio R.* (2022) 76 Cal.App.5th 421 [although mother reported she had no Indian ancestry, court erred by concluding DCFS had conducted adequate ICWA inquiry because it failed to inquire of extended family members]; *In re A.C.* (2022) 75 Cal.App.5th 1009 [same]; *In re H.V.* (2022) 75 Cal.App.5th 433 [court erred by terminating parental rights when DCFS failed to inquire of the maternal great-grandmother and maternal great-grandfather even though mother denied Indian ancestry].)  Other courts have held that a parent's unequivocal denial of Indian ancestry is substantial evidence to support a juvenile court's finding that ICWA does not apply.  (See *In re Charles W.* (2021) 66 Cal.App.5th 483, 486–488, 490–491 [court and agency made adequate ICWA inquiry where mother denied Indian ancestry]; *In re Austin J.* (2020) 47 Cal.App.5th 870, 887–888 [father's in-court statement and declaration provided substantial evidence that DCFS and court satisfied their initial duties of inquiry regarding ICWA]; *In re A.M.* (2020) 47 Cal.App.5th 303, 323 [no need for further inquiry if no one has offered information that would give court or child

27

welfare agency reason to believe child might be Indian child]; *In re H.V.*, *supra*, 75 Cal.App.5th at p. 441 (dis. opn. of Baker, J.) [parent's denials of Indian ancestry were substantial evidence to support court's finding ICWA did not apply].)

We agree with those cases that have held that the parents' unequivocal denial of Indian ancestry is substantial evidence to support the juvenile court's finding that ICWA does not apply. Applying that standard here, the record shows that the juvenile court's finding that ICWA did not apply was supported by the parents' unequivocal denials of Indian ancestry. M.C.'s claim that DCFS should have inquired further with maternal aunt and paternal grandmother is not persuasive. Importantly, the family was the subject of a previous dependency case, and the record reflects the previous case "deemed no known ICWA ancestry for the children." We also note that DCFS asked paternal grandmother L.R. about possible Indian heritage regarding son, and she indicated there was none. Because M.C. was the presumed father of daughter and son, paternal grandmother's denial of Indian ancestry would apply equally to daughter. M.C. also indicated on his ICWA-020 form that he had no Indian ancestry. Thus, there is no indication that inquiring further with paternal grandmother would have yielded any additional information regarding Indian ancestry. However, the record also reflects that M.C., despite being the presumed father, was not daughter's biological father. Despite efforts by DCFS to contact daughter's biological father, he could not be located. However, the record reflects that biological father had been involved in a previous dependency case with daughter, and thus the previous no-ICWA finding would apply here.

28

Likewise, there is no indication that maternal aunt would have had any information bearing on the children's possible Indian ancestry.  Like M.C., mother indicated on her ICWA-020 form that she had no Indian ancestry and there is no indication that maternal aunt had any additional information.  Maternal aunt and mother were in close contact, saw each other often, and talked "all the time."  On this record, it is reasonable to infer that mother and maternal aunt had access to the same ancestral information. There is no indication in the record that there was a discontinuity of family history or information available to mother. Further, during its investigation, DCFS interviewed the "parties" and indicated that it was not informed of any new information which would indicate the children were Indian children.

Under these circumstances, we conclude that the juvenile court's finding that ICWA did not apply was supported by substantial evidence.

## DISPOSITION

The juvenile court is ordered to strike the allegations of emotional abuse in counts a-4 and b-7 against M.C.  In all other respects, the orders are affirmed.

NOT TO BE PUBLISHED.

KIM, J.*

I concur:

EGERTON, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

LAVIN, Acting P. J., Concurring and Dissenting:

I agree with the majority opinion except for the interpretation and application of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related state laws implementing ICWA (Welf. & Inst. Code, § 224 et seq.).

The Department of Children and Family Services (Department) has a duty to inquire of the child's extended family members regarding the child's possible Indian ancestry—even when the parents denied having Indian ancestry. (See, e.g., *In re Antonio R.* (2022) 76 Cal.App.5th 421, 431 ["By requiring the Department to inquire of a child's extended family members as to the child's possible Indian ancestry, the Legislature determined that inquiry of the parents alone is not sufficient."].) And while the Department may have asked the paternal grandmother about the children's possible Indian heritage, it did not make a meaningful effort to locate and interview other extended family members to obtain whatever information they may have as to the children's possible Indian status. (See *In re K.R.* (2018) 20 Cal.App.5th 701, 709.) Further, the Department cannot omit from its reports "exactly which and when other family members were asked about Indian ancestry" and then claim that the sufficiency of its efforts cannot be challenged on appeal. (See *In re Josiah T.* (2021) 71 Cal.App.5th 388, 406 [the Department has a duty to document its inquiry and to provide clear information to the court so the court may rule on the question of whether ICWA applies].)

In sum, the juvenile court's finding that ICWA did not apply was error. I otherwise join in the analysis and conclusions of the majority opinion.


LAVIN, Acting P. J.